IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

CHARLIE DUKE and RONNIE L.
MAXEY                                                              PLAINTIFFS

VS.                           Case No. 05-CV-4044

DOMTAR a/k/a Domtar Industries, Inc.
a/k/a Domtar A. W. Corp.                                           DEFENDANT

## **MEMORANDUM OPINION**

Before the Court are Defendant Domtar's Motions for Summary Judgment and to Sever. (Docs. 8, 11 and 19) Plaintiffs Charlie Duke and Ronnie L. Maxey have responded. (Docs. 15 and 23) The Court held a hearing on the motions on June 28, 2006. The Court finds the motions ripe for consideration.

### I. BACKGROUND

Domtar is an international manufacturer of paper, pulp, and forest products that operates a paper mill in Ashdown, Arkansas. Charlie Duke and Ronnie L. Maxey were maintenance mechanics at Domtar's Ashdown Mill ("the Mill"). Since the mid-1990s, the Mill has utilized a "blanket purchase order system" which facilitates the purchase of parts used at the Mill by allowing certain employees, including mechanics within the maintenance department, to order parts on a Domtar account directly from approved vendors. Under the system, maintenance mechanics contact one of the approved vendors and place an order. The vendor then delivers the part to the Mill along with an invoice identifying the part and the mechanic who ordered it. After stopping at the receiving department where a receiving clerk signs the invoice for the part ordered and sometimes spot checks the order, the vendor delivers the part to the maintenance mechanic that ordered it or leaves the part at the mechanic's assigned drop zone. Tools may not

be purchased under the blanket purchase system. Instead, employees were given an allowance for standard tools and informed that larger or specialty tools were to be purchased by the mechanic's supervisors. Ashdown Automotive, a local NAPA parts dealership, was an approved vendor with which Domtar maintained an open account under its blanket purchase system.

In 2002, "a concerned and angry employee" sent an anonymous letter to Domtar reporting that Maxey and "Marty", an employee from Ashdown Automotive, were engaged in a scheme whereby Maxey would order high performance engine parts for his "hot rod" from Marty and charge the parts to Domtar under the blanket purchase order system. The letter reads, in part:

> Ron Maxey was building a hot rod and wanted some of them fancy GM performance cylinder heads, so he got Marty at Napa to order them for him. They were charged to [Domtar]. I don't know exactly how Marty got them to him, put them in his vehicle here, met him somewhere or if he picked them up at Napa. He wanted something else a week or so later, and Glen order it for him. Best I can remember it was a camshaft kit, it's been long enough that I don't recall exactly what it was that Glen got for him. ...
>
> It makes me sick that they have been getting away with this all this time. Far as I'm concerned, it's stealing. What if all of us wanted "free" stuff at the company's expense? Don't reckon we'd have a company with any money left after a while ... I can't prove any of the latest rumors, but I saw the invoice on the other stuff myself. Of course, it didn't say anything on the ticket about them being hot rod heads but they were. ...
>
>                 A concerned and angry employee.

(Doc. 9-4, p. 3)

Alarmed at the allegations in the letter, Domtar reviewed invoices of parts ordered under the blanket purchase system and discovered that between 1999 and 2001, there was a substantial increase in expenditures with Ashdown Automotive. Domtar's review of the invoices from Ashdown Automotive indicated not only that maintenance mechanics were buying unauthorized

tools through the blanket purchase order system, but also that some were buying equipment which did not have any apparent use at the Mill. Based on its initial review of the invoices, Domtar hired an outside investigative company, ISPA International ("ISPA"), to conduct a detailed investigation.

According to the invoices, Duke and Maxey had ordered unauthorized tools. The invoices also indicated that Duke and Maxey had ordered parts that did not have any apparent use at the Mill. As part of ISPA's investigation, Charles Whitehead, the lead investigator, and Brett Rattan, co-investigator, interviewed Marty Altenbaumer, the Ashdown Automotive employee identified in the anonymous letter. Altenbaumer helped the investigators identify items on questionable invoices of other maintenance mechanics, including Duke. Altenbaumer confirmed that Maxey ordered high performance engine parts from Ashdown Automotive and charged them to Domtar's account. On June 6, 2002, Altenbaumer provided the investigators with a signed statement. The investigators also interviewed Christy Burton, the former parts manager for a Chevrolet dealership, who corroborated Altenbaumer's story and confirmed that Altenbaumer had ordered high performance engine parts for Maxey through Domtar in the late summer or early fall of 1999. The investigators found 11 invoices from Ashdown Automotive totaling approximately $7,000 for high performance engine parts listing Maxey's name as the person ordering the parts. These parts had no use at the Mill.

After the investigators gathered information regarding the Ashdown Automotive invoices, they interviewed maintenance employees who were named on the questionable invoices. Prior to the interviews, Domtar notified Local Union President Tommy Yocom of the investigation and, pursuant to his request and law applicable to the collective bargaining

agreement between Domtar and PACE Local 5-1329, Yocom was permitted to attend all interviews of union employees as their union representative. On June 12, 2002, while Yocom attended in his role as Duke and Maxey's union representative, Whitehead, Rattan, and Steve Zimmerman, the Mill's Human Resources Manager, interviewed Duke and Maxey separately.

During Duke's interview, he acknowledged ordering some of the items on the invoices, but denied ordering other items. Duke stated the system was being abused, but not by him. Duke also stated Altenbaumer admitted to him that he had used Duke's name on invoices for items ordered by other employees. Duke asked Altenbaumer not to use his name for items purchased by others, but admitted that he did not report Altenbaumer's misusing his name to Domtar. Duke also stated he knew parts were being distributed to employees that did not order them and that a tool was delivered to him that he did not order.

When confronted with the 11 invoices during his interview, Maxey denied ordering the parts. When asked whether he could use high performance parts, Maxey acknowledged he owned a speed boat with a high performance engine. Maxey stated the ordered parts would not fit his boat's engine. During Duke and Maxey's interviews, Zimmerman and Whitehead threatened to have Duke and Maxey criminally prosecuted.[1] After the Maxey's interview, Domtar decided to terminate Maxey for ordering parts through the system that had no apparent use at the Mill. Zimmerman informed Maxey of the decision by telephone on June 14, 2002 and by a confirming letter on June 22, 2002. Zimmerman also sent Yocom a copy of the letter.

---

[1] Zimmerman and Whitehead deny threatening Duke and Maxey with criminal prosecution. Since there is a factual dispute regarding whether threats were ever made during these interviews, the Court will favor Duke and Maxey's version of the interview and assume the threats were made.

There is no evidence Zimmerman published the letter to anyone else except to Domtar management.

After Duke's interview, the investigators again interviewed Altenbaumer concerning his use of Duke's name on invoices that Duke claimed he did not order. Altenbaumer denied Duke's assertion and stated the he remembered Duke ordering some of the items in question. Specifically, Altenbaumer recalled that Duke ordered a solar booster pack and three sets of "blind-hole pullers." These parts could not be used at the Mill.

The investigators interviewed Duke a second time on June 14, 2002. Duke, the investigators, Steve Zimmerman, Gene Miller, Maintenance Department Manager and Yocom were present. Duke again denied ordering the three blind-hole pullers and the solar booster pack and again asserted that Altembaumer used his name on invoices for items ordered by other employees. Duke did not believe he had a responsibility to report abuses of the system to Domtar. At the conclusion on the second interview, Domtar suspended Duke pending further investigation.

On June 19, 2002, Altenbaumer signed a statement detailing the questionable purchases under Duke's name, including the solar booster pack and three blind-hole pullers purchases. Altenbaumer stated he never used Duke's name on an invoice other than for orders placed by him. The investigators completed their investigation and submitted a detailed report to Domtar on June 28, 2002. There is no evidence that the investigative report was published by Domtar to anyone outside Domtar management except union officials who requested the report during arbitration proceedings.

On July 2, 2002, Buddy Allen, the Mill's General Manager, and Zimmerman met with Barry Strange, another union representative, and Yocom to discuss the evidence against Duke. During the meeting, Domtar decided to suspend Duke. Domtar offered to suspend Duke for 10 days if he signed a letter of understanding. Duke was given a deadline of July 22, 2002 to accept the 10 day suspension and sign the letter of understanding. In the meantime, Domtar, the union, and Duke attempted to negotiate the terms of the Letter of Understanding. Ultimately, Duke refused to sign the Letter of Understanding. Consequently, Domtar fired Duke effective July 22, 2002.

During the grievance proceedings brought by the union on behalf of Duke and Maxey, the union produced a second statement dated July 19, 2002 and signed by Altenbaumer. In the statement, Altenbaumer admitted that he could not swear that Duke and Maxey personally phoned in the orders for various parts. However, Altenbaumer indicated he did not lie when giving his first statements. With respect to the delivery of parts, the statement showed Altenbaumer did not personally hand the parts to Duke or Maxey, but confirmed that Altenbaumer delivered parts to the drop zone designated for pickup by persons listed on the invoices. Altenbaumer's second statement did not change Domtar's opinion that Duke did not report abuses of the blanket purchase order system and that Maxey had ordered high performance parts through the system.

A third step grievance meeting was held on July 26, 2002, between Domtar and the union. On behalf of Domtar, Miller drafted August 5, 2002, letters responding to the third step grievance brought by the Union on behalf of Duke and Maxey. Miller sent this letter to three non-management employees, Duke, Yocom and Strange. The only statements Miller made about

the system and Maxey and Duke's grievance proceedings were in his capacity as a Domtar manager, and to union officials and certain witnesses for Maxey's later arbitration.

Duke filed a claim for unemployment compensation and a hearing was held on October 4, 2002. Zimmerman, Duke and Pamela Vance, an unemployment hearing officer, attended the hearing. Zimmerman told Vance why Domtar fired Duke. Duke's claim for unemployment compensation was denied.

The union sought arbitration of Duke and Maxey's termination, and arbitration hearings were held for Duke on May 16, 2003, and Maxey on June 19, 2003. Duke's arbitration focused on whether Duke was improperly disciplined for failing to report abuses of the blanket purchase order system. Witnesses testified at the arbitration. The arbitrator found Duke's suspension was warranted, but did not find just cause for his firing. The arbitrator ordered Domtar to reinstate Duke with full back pay and losses incurred during his unemployment. Maxey's arbitration focused on the issue of whether Domtar justly terminated Maxey for charging parts that had no use at the Mill. Witnesses testified at the arbitration. The arbitrator found Domtar should not have terminated Maxey and ordered Domtar to reinstate Maxey with full back pay and losses incurred during his unemployment. After the arbitration, Zimmerman told Yocom,[2] "Well, looks like you got your thieves' jobs back, now I'll probably lose mine." At some point, Allen told Yocom that Duke and Maxey looked guilty. There is no evidence that Zimmerman, Allen, Miller

---

[2] Yocom has since died. Duke and Maxey testified that Yocom told them of Zimmerman and Allen's statements prior to his death. Zimmerman and Allen deny making the statements. Since there is a factual dispute regarding whether these statements were made, the Court will favor Duke and Maxey's version and assume the statements were made.

or any Domtar manager talked about the investigation of Duke and Maxey or the reasons for their termination to individuals in the Ashdown community.

Duke and Maxey filed this suit in the Circuit Court of Little River County, Arkansas alleging defamation and slander causes of action against Domtar. Domtar removed this case to this Court on the basis of diversity of citizenship. In its motions for summary judgment, Domtar argues any communications forming the basis of Duke and Maxey's slander and defamation claims are privileged and/or hearsay.

## II. DISCUSSION

**A.     Standard of Review**

The standard of review for summary judgment is well established. The Federal Rules of Civil Procedure provide that when a party moves for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, show that there is no genuine issue as to a material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c); *Krenik v. County of Le Sueur*, 47 F.3d 953 (8th Cir. 1995). The Supreme Court has issued the following guidelines for trial courts to determine whether this standard has been satisfied:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial-whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). *See also Agristor Leasing v. Farrow*, 826 F.2d 372 (8th Cir. 1987); *Niagra of Wisconsin Paper Corp. v. Paper Indus. Union-Management Pension Fund*, 800 F.2d 742, 746 (8th Cir. 1986).

The Court in *Scherr Const. Co. v. Greater Huron Development Corp.*, 700 F.2d 463, 465 (8th Cir. 1983)(quoting, *Burst v. Adolph Coors Co.*, 650 F.2d 930, 932 (8th Cir.1981)(emphasis added), a case involving the entry of summary judgment, stated:

> [w]hen a motion for summary judgment is made and supported by affidavits, the party opposing the motion may not rest on the allegations in his pleadings but must resist the motion by setting forth *specific facts* that raise a genuine issue of fact for trial.

**B.     Privileged Statements**

The following elements must be proved to support a claim of defamation: (1) the defamatory nature of the statement of fact; (2) the statement's identification of or reference to the plaintiff; (3) publication of the statement by the defendant; (4) the defendant's fault in the publication; (5) the statement's falsity; and (6) damages. *Northport Health Services, Inc. v. Owens*, 356 Ark. 630, 158 S.W.3d 164 (2004). Domtar argues, however, that even if Duke and Maxey can establish that certain statements made by Domtar's investigators and management are defamatory, Duke and Maxey's defamation claims should be dismissed because the statements are also privileged. For purposes of ruling on Domtar's motions, the Court will assume each of the statements meet the six elements listed above, but look at each statement to determine whether the statement is privileged. An allegedly defamatory communication may be held to fall under a qualified privilege when the statement is made in good faith and in reference to a subject matter in which the communicator has an interest or duty and to a person having a corresponding interest or duty. *Wal-Mart Stores, Inc. v. Lee*, 348 Ark. 707, 74 S.W.3d 364 (2002). However, even if a statement falls under the qualified privilege, if a person making the statement steps outside the bounds of the privilege or abuses the privilege, the qualified privilege is lost.

*Navorro-Monzo v. Hughes*, 297 Ark. 444, 763 S.W.2d 365 (1989). The qualified privilege does not extend to publication of statements that have no relation to the interest entitled to protection and is lost if the publication is not made for the purpose of furthering common interest. *Id.*, 297 at 450, 763 S.W.2d at 637. The qualified privilege may be lost by the publisher of a defamatory statement if it is abused by excessive publication, if the statement is made with malice, or if the statement is made with a lack of grounds for belief in the truth of the statement. *Superior Federal Ban v. Mackey*, 84 Ark.App. 1, 129 S.W.3d 324 (Ark.App.2003); *Addington v. Wal-Mart Stores, Inc.*, 81 Ark.App. 441, 105 S.W.3d 369 (Ark.App. 2003).

### 1. Zimmerman's Testimony to the Unemployment Office

After Duke filed for unemployment benefits, Pamela Vance, an unemployment officer, held a telephone hearing with Duke and Zimmerman. Zimmerman testified Domtar fired Duke for abusing the blanket purchase order system. As a result of Zimmerman's testimony, Vance denied Duke unemployment benefits. In a defamation action, statements made by employees of a defendant to the employment security division come within a qualified privilege afforded an employer if the statements were made in good faith with reasonable grounds for believing them to be true on a subject matter in which the author had a public or private duty to a person having a corresponding duty. *Dillard Dept. Stores, Inc. v. Felton*, 276 Ark. 304, 634 S.W.2d 135 (1982). In *Felton*, the Arkansas Supreme Court noted that a discharged employee's entitlement to benefits depends on the circumstances of his termination. *Id.*, 276 Ark. at 309, 634 S.W.2d at 137. Furthermore, employers have a duty to accurately report the circumstances of an employees' termination to unemployment offices. *Id.* Zimmerman had a public duty to testify truthfully to Vance about the circumstances of Duke's termination. There is no evidence

Zimmerman's comments were made in bad faith or that his grounds for believing the statements were unreasonable. At the time Zimmerman testified to Vance, Duke's third-step grievance had been denied and Domtar was still of the opinion that Duke had abused the blanket purchase order system. Zimmerman testified so at the hearing and his statements fall within the qualified privilege.

2. **Investigators' Statements Made During the June 12 and 14, 2002 Interviews**

During Duke and Maxey's investigatory interviews, Zimmerman and Whitehead threatened them with criminal prosecution for theft. Yocom was present at these interviews as a union representative. The Arkansas Supreme Court has addressed whether threats of criminal prosecution made during these types of investigatory, employment-related meetings with union representatives present fall under the qualified privilege. *See Polk v. Missouri Pac. R. Co.*, 156 Ark. 84, 245 S.W. 186 (1922). In *Polk*, the defendant railroad company conducted a grievance meeting after firing employees who were members of a union. *Id.*, 156 Ark. at 84, 245 S.W. at 187. During the meeting attended by union representatives, the railroad's superintendent accused the employee of padding the payroll in order to pay his son, also a railroad employee, for work on days when the son had not worked. *Id.*, 156 Ark. at 84, 245 S.W. at 188. The superintendent told the employee, "Mr. Polk, are you prepared to reimburse the company for the time you defrauded them out of? Unless they are reimbursed you stand liable for criminal prosecution by the company." *Id.*, 156 Ark. at 84, 245 S.W. at 187. Union representatives were present at the meeting, as was the usual practice. *Id.*, 156 Ark. at 84, 245 S.W. at 188. The Arkansas Supreme Court found the superintendent's threats to enjoy the qualified privilege. As in *Polk*, the Court believes that the threats made during the interviews in the presence of Yocom, Duke and

Maxey's union representative, are subject to the qualified privilege. The subject matter of the meeting was Duke and Maxey's name on suspicious invoices ordering parts that had no use at the Mill. Duke, Maxey, Domtar management, and the investigators all had an obvious interest in this subject matter. *See, e.g., Felton*, 276 Ark. at 308, 634 S.W.2d at 137 (employee, warehouse manager, and supervisor, all had a legitimate interest to investigate employee's possession of merchandise without a receipt; qualified privilege applied to statements made during closed-door meeting with employee, warehouse manager, and supervisor). Yocom, as a union representative, had a corresponding interest in remarks made during the interviews because he was charged with the responsibility of protecting the employment of Duke and Maxey as union members. *See, e.g., Handlin v. Burkhart*, 101 A.D.2d 850, 476 N.Y.S.2d 164 (N.Y.App.Div.1984) (union representatives had an interest in remarks made by employer in termination report constituting reasons employees were fired).

Next, the Court must decide whether the threats were made with malice. If so, Domtar loses the qualified privilege. The burden of showing malice that would justifying Domtar losing the qualified privilege is on Duke and Maxey. *See Ikani v. Bennet*, 284 Ark. 409, 682 S.W.2d 747 (1985). Malice that defeats the qualified privilege means something more than fictitious legal malice which is implied in order to impose strictly liability for unprivileged defamation. *Navorro-Monzo*, 297 Ark. at 450, 763 S.W.2d at 638-9 (1989). The *Polk* decision is instructive as to what actions constitute malice sufficient to abuse the qualified privilege. The case reads

> The only testimony here which would indicate malice or other improper motive on the part of [the superintendent] is the testimony of Moreland that [the superintendent] appeared to be antagonistic in his examination of Polk. But we think that testimony insufficient to support a finding that [the superintendent] was prompted by malice. [The superintendent's] belief in Polk's guilt, which was apparently sincere, although

12

> we presume it was mistaken, would make him antagonistic to Polk. There was no denunciation or abuse, nothing except earnestness in the examination of Polk by [the superintendent], and the language quoted as actionable was not collateral to the inquiry because the discharge of Polk's son was one of the subjects of inquiry, and, as we have said, the alleged cause of the son's discharge furnished equal grounds for the discharge of Polk himself.

*Polk*, 156 Ark. at 84, 245 S.W. at 188-9. As in *Polk*, there is no indication here Zimmerman and Whitehead's threats were made with malice. The interviews were clearly tinged with antagonism. Any such investigation into an employee's alleged theft from his employer would be. However, there is no indication the interviews crossed the line into abuse tinged with malice. There is also no indication of excessive publication or that Domtar management and the investigators present at the meeting should doubt the truthfulness of their assertions. At the time of the meeting, Domtar's investigators had interviewed Altenbaumer, who, at that time, confirmed that Duke and Maxey had ordered the parts on the suspicious invoices. Therefore, the Court finds the qualified privilege applies to all communications made during the investigatory interviews of Maxey and Duke.

### 3. Statements Made During Duke and Maxey's Grievances

That defamatory statements at issue here are contained in the August 5, 2002 letters drafted by Miller, the Maintenance Manager, in response to Duke and Maxey's third-step grievances. The letters restate Domtar's investigation of Duke and Maxey for abusing the blanket purchase order system and set forth Domtar's allegations of the abuses. The letters were sent to Duke, Maxey, and union representatives Yocom and Strange. Letters recounting events precipitating action against union employees by employers sent pursuant to a collective bargaining agreement are absolutely privileged and cannot form the basis of an employee's

13

defamation claim.  *See Brown v. Comair, Inc.*, 803 So. 2d 896 (Fla.Dist.Ct.App.2002); *Stiles v. Chrysler Motors Corp.*, 89 Ohio App.3d 256, 624 N.E.2d 838 (Ohio Ct.App.1993); *Hasten v. Phillips Petroleum Co.*, 640 F.2d 274 (10thCir.1981), *Turner v. Gateway Transp. Co., Inc.*, 569 S.W.2d 358 (Mo.Ct.App. 1978); *see also Brooks v. Solomon Co.*, 542 F.Supp. 1229 (N.D.Ala.1982); *Merritt v. Detroit Memorial Hospital*, 81 Mich.App. 279, 625 N.W.2d 124 (Mich.Ct.App.1978).  The Court finds the August 5, 2002 letters responding to Duke and Maxey's third-step grievances are absolutely privileged and cannot form the basis for Duke and Maxey's defamation claims.

To the extent Duke and Maxey allege witnesses' testimony given during their grievance and arbitration proceedings were defamatory, the law is crystal clear that such testimony is absolutely privileged as well.  *Johnson v. Dover*, 201 Ark. 175, 143 S.W.2d 1112 (Ark.1940) (statements made by a witness in regular course of a judicial proceeding are absolutely privileged where they are directly or fairly responsive to questions propounded or where they are relevant to the subject on inquiry, whether they are false or malicious); *General Motors Corp. v. Mendicki*, 367 F.2d 66 (10thCir.1966) (statements made either by representative of management at a conference and bargaining session to adjust a grievance of an employee are absolutely privileged); *Sturdivant v. Seaboard Service System, Ltd.*, 459 A.2d 1058 (D.C.1983) (absolute privilege attached to testimony by witness in arbitration proceeding arising from dismissal of cashier from employment where witness was an investigator hired by company).  Therefore, the Court finds testimony given during the grievance and arbitration proceedings are absolutely privileged and cannot form the basis of Maxey and Duke's defamation claims.

4.  **Statements Made to Yocom by Zimmerman and Allen**

Prior to Yocom's death, he told Maxey and Duke that Zimmerman stated to him after their arbitrations, "Well you got your thieves' jobs back, now I'll probably lose mine." At some point during the investigation, grievance or arbitration, Allen told Yocom that Duke and Maxey looked guilty. Yocom is now dead. Duke and Maxey testified that Yocom told them of these statements prior to his death. These statements cannot form the basis of Duke and Maxey's defamation claim because the statements are clearly hearsay under Fed. R. Civ. P. 801(c) and Duke and Maxey have made no argument that the statements are not hearsay or fall under one of the exceptions to the hearsay rule. Duke and Maxey cannot take the stand and testify as to what Zimmerman and Allen told Yocom as relayed to Duke and Maxey by Yocom prior to Yocom's death.

In closing, the Court notes Duke and Maxey's argument in response to the motions for summary judgment is that everyone at the Mill and the Ashdown community knew they had been accused of and fired because of theft. So, someone in Domtar management or the investigators must have been the source of the community and Mill's talk about Duke and Maxey. This type of general response is not strong enough to defeat the motions for summary judgment before the Court. The Court has no doubt Duke and Maxey's discharge was the subject of rumor in the Ashdown community and at the Mill. Obviously, Duke and Maxey's reputations were damaged because of the talk, but it does not necessarily follow Domtar is liable for such damages under the evidence as presented. The Court believes Duke and Maxey have not met their burden in responding to the motions for summary judgment by pointing to specific evidence of defamatory

15

statements that are not privileged or hearsay.  Therefore, the Court must grant Domtar's motions for summary judgment.  The Court need not address Domtar's motion to sever.

### III. CONCLUSION

For reasons discussed herein and above, the Court finds Defendant's Motions for Summary Judgment should be and hereby are **granted.**  An order of even date shall issue.

IT IS SO ORDERED, this 3rd day of August, 2006.

>  /s/ Harry F. Barnes
> Hon. Harry F. Barnes
> U.S. District Court